## The Northern Ohio Traction & Light Co. *v.* Reining, Admx.

*Negligence—Exercise of care—Carriers and passengers—Liability—Injuries received after relationship ceases—Duty of conductor in discharging passengers—Warning of danger from passing automobiles.*

1. A street car company owes to a passenger, while the relation of carrier and passenger exists, the highest degree of care, but such relationship and duty terminate when the passenger steps from the car upon the street. After discharging the passenger safely upon the street the company is not responsible for injuries thereafter received by him from an independent source, or for his safe passage from the car to the sidewalk.

2. It is not the duty of a conductor or motorman to warn discharging passengers, prior to alighting at a regular stop in a city street, of the danger of approaching automobiles, and the failure of a motorman to so warn such a passenger will not render the company liable for injuries caused by the discharged passenger being struck by a passing automobile after alighting in safety upon the street.

(Decided May 8, 1922.)

Error: Court of Appeals for Cuyahoga county.

*Mr. P. L. A. Lieghley,* for plaintiff in error.

*Messrs. Day, Day & Wilkin* and *Messrs. Amerman & Mills,* for defendant in error.

SULLIVAN, J. This cause comes into this court on proceedings in error from the court of common pleas of Cuyahoga county.

Lacey Reining, as administratrix of the estate of C. H. Reining, her husband, commenced an action in the court of common pleas against The Northern Ohio Traction & Light Company and one L. E. Griffith. There was a covenant not to sue between Griffith and the administratrix, and under such covenant the administratrix was paid the sum of $5,000, and thereupon the case proceeded to trial against the defendant The Northern Ohio Traction & Light Company, upon a second amended petition and a supplement thereto; but the supplement is a mere incident in the cause, as it relates only to the due execution of the covenant not to sue, in favor of Griffith.

The decedent, a person in good health, about forty-eight years of age, was killed as he alighted from a street car in Canton, Ohio, operated by defendant below. Upon trial of the cause, the jury returned a verdict of $10,000 in favor of the plaintiff, and then and thereupon a motion for a new trial was filed and overruled and judgment entered upon said verdict. Proceedings in error are now prosecuted to this court to reverse the judgment below, upon the following grounds:

1. Said verdict and judgment are manifestly against the weight of the evidence, for the reason that the deceased was clearly guilty of contributory negligence.

2. Said verdict and judgment are not sustained by proper evidence and are contrary to law.

3. The trial court erred in overruling the motion of defendant at the close of plaintiff's evidence to direct a verdict in favor of the defendant.

4. The trial court erred in overruling the motion of defendant for a new trial.

5. Said judgment was rendered in favor of plaintiff when it ought to have been given for the defendant.

After the plaintiff below had concluded her testimony, the defendant below made a motion to direct a verdict in its behalf, and the court overruled the same. Thereupon counsel for defendant stated to the court that no evidence would be offered in behalf of defendant for the reason that the testimony if offered would be of similar character and present the same situation as the evidence adduced upon the part of the plaintiff. Thereafter defendant rested and the court charged the jury.

In the second amended petition the acts of negligence charged against the defendant were as follows:

That said defendant permitted, invited and directed the plaintiff's decedent to alight from one of its street cars on the left-hand side thereof, while from the direction opposite that in which the street car was going a rapidly approaching automobile, driven by L. E. Griffith aforesaid, was about to pass, and that defendant below was fully aware of the approach of such automobile, and its dangerous rapidity, and that decedent was in danger of being struck thereby.

The defendant set forth a general denial of the allegations of the second amended petition, and al-

leged contributory negligence on the part of the decedent. The reply of the plaintiff below was in the nature of a general denial.

The record of the proceedings discloses that the plaintiff in error, on the date of the accident, to-wit, December 13, 1918, at about 5:30 P. M., was operating electric street car lines in the city of Canton, Ohio; that the decedent at that time was a passenger on one of the cars of the plaintiff in error, and intended to alight at the intersection of Prospect avenue and Ninth street, Southwest, in such city; that decedent took passage on such car on the Public Square of Canton, Ohio, about one mile from the point of the accident; that there was but one track at the point of the accident, and the car was in charge of a motorman; that the street car stopped at the corner of Prospect avenue and Ninth street, aforesaid, and decedent alighted from the car in safety to the street, from the left-hand front door of the street car; that it was customary for passengers to alight at that intersection either from the left-hand front door or the right-hand rear door, and that prior to the accident decedent himself had been a frequent passenger on that line, and by reason thereof had full knowledge of the said custom and situation; that the car was crowded, and, that, at the time of alighting, decedent, from the interior of the car proper, proceeded to the front platform, and, turning to the left, descended the steps and proceeded to a safe place on the street, and after having taken one step or two steps after alighting in safety was struck and killed by the automobile of said Griffith, coming at a rate of thirty-five miles an hour from the south, and thrown a distance of from seventy-five to one hundred and twenty-five

feet toward the curbstone at the right or east side
of the street, and eastwardly from the street car,
which had been proceeding south on Prospect ave-
nue to its intersection with Ninth street; and that
there was from one to two feet leeway between the
street car and the automobile for the passing auto-
mobile, and the same between the curb and automo-
bile. It further appears from the record that the
front part of the street car was crowded at the time
of alighting, as aforesaid, and there is evidence
tending to show that there were passengers stand-
ing between the decedent and the window in front of
the motorman of such street car as decedent was
proceeding to descend from the car, and it further
appears that the motorman, who was looking ahead,
gave no warning to the decedent or other passengers
of the aforesaid approaching automobile, and that
the decedent received no warning or notice from the
passengers at the front end of the car, some of
whom testified that they saw the approaching au-
tomobile at distances ranging from fifteen feet to a
half a block away prior to the accident.

While there is some conflicting testimony in the
record, there is one fact that appears to be estab-
lished beyond question, to-wit, that the decedent de-
scended from the steps of the street car to the
street in safety, and that he was struck in the street
by the automobile after he had so alighted and had
taken either a step or two steps from the place on
the street where he first alighted; but whether he
had gone farther on the street than one or two steps
before he was struck can only be inferentially de-
termined by the physical fact that the force and vio-
lence of the automobile when it struck him threw
him to the right a distance of from seventy-five to

a hundred feet, with his head near the east curb of the street, and away from, instead of toward the street car from which he had as aforesaid alighted.

It is a universally established rule of law, derived from the uniformity of decisions of our courts, that the carrier owes the passenger, while he is a passenger, the highest degree of care, but that there is a time and place when the relationship of carrier and passenger ceases, and that when said relationship ceases the passenger becomes a traveler upon the streets, obligated with the common duties and responsibilities of other travelers, and that when the period arrives when said relationship is terminated the legal responsibility of the carrier to the passenger ceases.

In *Creamer* v. *West End Street Ry. Co.,* 156 Mass., 320, we read as follows:

"One who steps from a street railway car to the street is not upon the premises of the railway company, but upon a public place where he has the same rights with every occupier, and over which place the company has no control. His rights are those of a traveler upon the highway, and not of a passenger."

From *Chattanooga Electric Railway Co.* v. *Boddy,* 105 Tenn., 666, 669, we quote the following:

"On this question there is a conflict of authority, but we think the more reasonable view is that where a man who has traveled on a street car steps from the car upon the street, this terminates his relation and rights as passenger, and the railway company is not responsible to him as carrier for the condition of the street or for his safe passage from the car to the sidewalk."

From *Smith* v. *City Railway Co.,* 29 Ore., 539, at page 545, we quote the following:

"The relation of passenger and carrier ceased when she alighted from the car, and thereafter the defendant owed her no other or different duty than it owed to any other ordinary traveler."

In *Indianapolis Street Railway Co.* v. *Turner,* 32 Ind. App., 311, the first paragraph of the syllabus is:

"One who alights from a street car on which he has been a passenger at once becomes a traveler upon the public thoroughfare, charged with the duty of exercising due care."

Bearing upon the same issue, we cite: *Quinlan* v. *Newton & Boston St. Ry. Co.,* 191 Mass., 58; *Jonas* v. *South Covington & Cincinnati St. Ry. Co.,* 162 Ky., 171; *Conway* v. *Lewiston & Auburn Horse Rd. Co.,* 87 Me., 283; *Powers* v. *Connecticut Co.,* 82 Conn., 665, and *Marsh* v. *Boyden,* 33 R. I., 519.

A number of the authorities heretofore quoted are cited in the opinion of the court in the case of *Chesley, Admr.,* v. *Waterloo, Cedar Falls & Northern Rd. Co.,* 188 Iowa, 1004. This case was decided by the Supreme Court of Iowa in 1920.

In the instant case, the decedent alighted at a regular stop, but in the *Chesley case, supra,* the passenger alighted at a place not designated by the company for the taking on or discharging of passengers, but, as in the instant case, the plaintiff, after he had alighted, took either one or two steps toward the curb, when an approaching automobile killed him. The *Chesley case, supra,* decided in 1920, as aforesaid, is in many respects very similar to the case at bar, especially upon the charges of negligence. The syllabus in that case as reported in 12 A. L. R., 1366, reads:

"A street railway company which permits a pas-

senger to alight from a car at a place not ordinarily used for discharging passengers, and where many automobiles are accustomed to pass, is not bound to warn him of the danger from passing cars, nor to protect him from such danger after he has left the car.''

In the case at bar this same issue is raised, to-wit: Ought the motorman, who was looking straight ahead, have warned the decedent of the swiftly approaching automobile at the time and place he attempted to alight?

In considering this question, it is well to note the facts as they appear from the record. The street car was crowded; the track was a single one; and the car was without a conductor, and, therefore, in full charge of the motorman. Said car stopped at a regular stopping place, familiar to the decedent, as he had lived in the city and traveled upon that street car line, and he elected to be discharged from one of the two customary places for such purpose, to-wit, the left-hand door at the front end of the car. At this point, well known to decedent, the traffic was congested, for it appears from the record that from four to eight automobiles passed by at that intersection per minute. In other words, there was almost a constant stream of automobiles passing. From this condition it was inevitable that danger existed almost every moment from passing automobiles, regardless of their speed. Under these conditions, with all the obvious duties and responsibilities resting upon the motorman to keep in touch with the passing traffic upon the street, was it his duty to warn discharging passengers, prior to alighting, of the danger of approaching automobiles, a danger common to all who used the streets at such

time and place? The motorman was charged with the responsibility and duties of protecting all his passengers on the car from this same dangerous traffic at this congested point, for the automobile traffic, at least, going in the same direction, had equal rights in the street and in the tracks themselves. It would be his duty to see that there was a clear and safe passage through the traffic for the passengers on the car, and to protect them from collisions between the street car and automobiles, either going in the same direction or crossing over the street car track in front of him for the purpose of going in other directions, either east or west, or to reverse the direction in which they were bent. Pedestrians had a right to cross the street, and it is conclusive from the congestion at this point that one of the duties of the motorman was to guard his own passengers from any accidents that might arise to them or to others using the street, either by vehicle or on foot, who might be in the way of his progress.

These facts are recited for the purpose of bearing upon the question whether, under all these circumstances and conditions, there was a duty devolving upon the motorman in the instant case to warn the decedent of the approaching automobile which finally killed him after he alighted from the street car safely upon the street and then and there and thereupon became a traveler upon the public highway with the other travelers upon such street, his relation as a passenger on the street car having terminated when he alighted upon the street safely as aforesaid.

Suppose the decedent, instead of being struck after he had taken but a step or two after alighting

in safety, had walked to a distance of two feet from the sidewalk before being struck by this same automobile, encompassed by all the other facts in the record, it is inconceivable to say that because the motorman did not first warn him the carrier would be liable, especially if decedent looked neither to the right nor the left, when alighting from the car.

Again quoting from the *Chesley case, supra,* page 1006 of 188 Iowa:

"The place at which he alighted was not, in and of itself, dangerous or unsafe. It was a place open for public travel, and, in the absence of any showing, we must suppose in a reasonably safe condition for the public's use. While the defendant was on the car, while he was a passenger, the company owed him the high duty which the law imposes upon common carriers. When that relationship ceased, this high duty ended. When he passed from the car onto the street, his relationship with the company ended, and he became, as any other traveler upon the public highway, subject to the perils of such travel. What legal duty then did the company violate or neglect that contributed to or caused the injury that resulted in his death? It received him as a passenger, carried him in safety to a point where he signified a desire to sever his connection with the company as a passenger."

As was heretofore said, the intersection of Ninth street and Prospect avenue, where decedent alighted, was a regular stopping place for passengers on that line. There is no claim made that at the point of alighting there was any danger arising from the street itself, in the way of defect, or otherwise, and it was the place decedent himself selected for the purpose of alighting. The traffic and the danger

thereof were not a situation which the plaintiff in error in any wise created, or could, by any possible view, control or change.

Again quoting from the *Chesley case, supra,* page 1007:

"There is no doubt that the peril was greater, but was it a peril against which the company owed a duty to afford the deceased protection? Deceased had a right to sever his connection with the company as a passenger at any time. The company had not agreed to carry him to any particular point, nor had it assumed any contractual duty to discharge him at any particular point, nor had he advised the company at what point he desired to be released from the car and to sever his connection with the company as a passenger, except as indicated by his act in leaving at this point. He chose his time and place, and he was within his right in doing this. All passengers are discharged upon the public streets, even when discharged at the near crossing. The right of the passenger to sever his connection at any point is a legal right of which he may avail himself—a right which the company cannot deny him. At least, it owes no duty to forcibly detain him after he has expressed his desire to sever his connection and leave the car. There is nothing in this record to show that the peril was greater at the point where he did alight than it would have been at the near intersection, except as that peril may be found in the suppositional fact that those using the street for traffic would be less on their guard, less watchful and careful, in the middle of the block than they would be at the near intersection."

At the time the case at bar was argued to this court, the Supreme Court of Ohio had rendered a

decision in *Mahoning & Shenango Railway & Light Co.* v. *Leedy,* 104 Ohio St., 487, but the opinion had not been published prior to argument in this court, but counsel for plaintiff in error has submitted since this case was argued the opinion of the Supreme Court in the *Leedy case,* the syllabus thereof, during the argument, having been referred to by counsel for defendant in error. The defendant in error in the *Leedy case, supra,* was a passenger on the street car of the plaintiff in error, and was desirous of leaving the car at Broadway street in Youngstown, a regular stopping place of the cars of plaintiff in error. At the intersection of Broadway and the street upon which the car was operated the car stopped, and certain passengers alighted therefrom, but the defendant in error, before she was able to alight, and while on the way for that purpose, found that the conductor had closed the door and signalled the motorman to start the car, whereupon defendant in error protested, and an argument was had, and, after the street car had left the regular stop, the conductor gave the signal to the motorman to again stop the car, whereupon, the defendant in error attempted to alight, and, either while alighting, or immediately after she had alighted, was struck by a passing motorcycle and injured.

One of the main questions in that case was whether or not the street car company had created the danger by stopping the second time, inasmuch as there was an ordinance proclaiming to the public using the highway that such cars stopped only at the regular stopping places to discharge passengers.

Upon the question of the duty of the motorman to warn a passenger intending to alight of the dangers of the traffic, the *Leedy case, supra,* becomes

obviously significant, and bears directly upon the case at bar, because in the instant case the stopping place was regular and in the *Leedy case,* irregular, and yet we find the court in the *Leedy case,* in the syllabus thereof, used the following language:

"1. Where a street railway company operating its cars upon public streets has itself created a sudden situation of danger, it is the duty of such street railway company before discharging a passenger into such dangerous situation by itself created to either remove the dangerous situation or warn the passengers of its existence.

"2. Where the dangerous situation created by the carrier is alike known to the carrier and the passenger, the passenger is bound to exercise ordinary care to prevent injury to herself, but, where the carrier through its servant by discourteous and impatient conduct and language confuses and disturbs the passenger so as to interfere with the deliberate exercise of her faculties, it is a question for the jury whether her failure to look before stepping upon the step of the car or before stepping upon the ground from the step amounted under the circumstances to a failure to exercise ordinary care.

"3. When the carrier, a street railway company, has carried its passenger in safety and discharged her in safety on the street, and the danger was not there at that time, the carrier has discharged its obligation to the passenger, and a charge to the jury which may fairly be construed to authorize a recovery for an injury received from an independent source, subsequent to the discharge of the passenger in a place of safety, is erroneous and prejudicial."

The defendant in error in the *Leedy case* recovered a judgment in the court of common pleas, and error was prosecuted to the Court of Appeals, where the judgment of the common pleas court was affirmed, but the Supreme Court reversed the lower courts on the grounds laid down in the syllabus, as aforesaid, and used the following language in the last paragraph of the opinion:

"The case will be reversed upon the sole ground that the court charged the jury, in effect, that the plaintiff in error could be held liable even though it discharged the passenger in a place of safety 'and the danger was not there at the time,' for an injury which she thereafter received from an independent source."

In the face of the above authorities, and especially in view of the holding of our own Supreme Court in the *Leedy case, supra,* we do not regard the opinion in the case of *Wood* v. *North Carolina Public-Service Corporation,* reported in 174 N. C., 697, as sufficient authority to have any material weight in the case at bar. In the first place it will be observed that four judges sat in the North Carolina case, Judge Allen, rendering the opinion, and Clark, C. J., concurring therein, but the dissenting opinion, rendered by Walker, J., was concurred in by Brown, J. It further appears in paragraph 3 of the syllabus in that case, that one of the controlling factors which led to the decision was that it appeared from the record that the passenger looked and failed to see, and it was inferable that the failure to see was because the approaching danger was on the other side of the car where she could not see, and that seemed to be a fact that had a great bearing upon the question of the duty of the

motorman to notify the passenger or give warning of the approaching danger. However authoritative the case may be, it could not take precedence in governing this court as against the holding of our Supreme Court in the *Leedy case,* above referred to. *Barr* v. *Toronto Ry. Co.,* in 9 British Ruling cases, 857, decided in the Ontario Appellate Division, is cited by counsel for defendant in error, but we think it does not apply to the facts in this case, as in that case the street railway company itself either created the danger, or knew that by starting the street car the former passenger was in such a situation that injuries would inevitably result to him because of the starting of the car; and because the motorman started the car, when it could not pass without injuring the former passenger, the court held that it was negligence. The former passenger was in the same position as any other traveler upon the public highway. The latter would have a similar cause of action under the same circumstances, even though he had not been a passenger upon the car. It will be noticed in the *Barr case, supra,* that the Chief Justice, in rendering the judgment of the court, uses the words "traveler upon the highway," which is significant as bearing upon the issue that the relationship of carrier and passenger had ceased. The court further says, at page 860, as distinguishing the *Barr case, supra,* from the case at bar:

"If there had been no pool of water and nothing else to prevent the female respondent from going, after she had alighted from the car, to the sidewalk before the car was started, but she had unnecessarily delayed to do that and her injury had resulted from that delay, I should have agreed with the contention of the appellant that it was not liable for the

injury; but in this case the conductor and the motor-
man knew or ought to have known that their pas-
sengers would not, at all events, be likely to wade
through the pool, but would do as the female re-
spondent and her sister-in-law did, proceed to the
rear of the wagon in order to be able to pass dry-
shod to the sidewalk. They also knew that the
horses and wagon were where they were, and that
the space between them and the car when it rounded
the curve was so small that anyone who was stand-
ing or walking in that space would inevitably be
struck by the moving car; and they were therefore,
in my opinion, guilty of negligence in starting the
car without first making sure that the passengers
who had left the car were not still between it and
the wagon; and that negligence was the proximate
cause of the injuries which the female respondent
received."

In other words, the negligence was the starting
of the street car.

Upon the assignment of error designated as con-
tributory negligence, it appears from a review of
the record, and the briefs of counsel, that there is
another fact well established in the case at bar, to-
wit, that if, because of the obstruction of other pas-
sengers between him and the window in the front
part of the street car, as he was about to alight, de-
cedent was prevented from seeing the approaching
automobile, there was nothing to prevent him, had
he looked before he alighted from the last step of
the street car, from seeing the approaching automo-
bile and remaining upon such step until the automo-
bile had passed. Was it not more obligatory upon
the decedent, since his view was obstructed at the
window, to look before he left the last step of the

street car platform? The evidence is conclusive that before alighting from the car, the decedent did not look to the right nor to the left, but was busy taking his case of tools from the steps with him to the ground, and without looking in any direction, excepting toward the east, the location of the sidewalk, he proceeded a step or two after alighting in safety.

Conceding for the purpose only of argument that it was the duty of the motorman to warn the decedent before alighting, it yet remains that there was a duty on the part of the decedent equal, at least, to the duty of the motorman, to exercise ordinary care, and if he failed to use his senses and his faculties at the time of alighting, with full knowledge of the dangers of the traffic, as appears from the record in the case, was he in the exercise of ordinary care, and could he be excused upon the question of contributory negligence, even though it was the duty of the motorman to warn him, if he had equal opportunities with the motorman for observing and apprehending danger from the approaching automobile? There can be no question but that his opportunities were equal. The window was not the only place that the decedent could observe the approaching automobile. It appears from the record that the last step projected somewhat from the side of the car, and without question the decedent had an unobstructed view, both to the right and left, of the congested and dangerous traffic in the streets. With from four to eight automobiles passing by the place of accident every minute, danger succeeded danger. It was so continuous, from the record in the case, that even if it was the duty of the motorman to warn the decedent, it would be al-

most impossible to separate the safe moments from the dangerous moments, and if the motorman were to be charged with such a duty and such a responsibility, under such conditions, it is fairly reasonable to conclude that accidents would be multiplied instead of decreased, because of the inevitable uncertainty of the judgment exercised by the motorman in the face of all his other duties in guarding alighting passengers from the continuous, congested and dangerous traffic in the streets of a municipality.

Bearing upon this question of contributory negligence, we again cite the second paragraph of the syllabus in the *Leedy case, supra,* as follows:

"2. Where the dangerous situation created by the carrier is alike known to the carrier and the passenger, the passenger is bound to exercise ordinary care to prevent injury to herself * * *."

We also call attention to the case of *Kauffman* v. *Nelson,* 225 Pa., 174, the first paragraph of the syllabus of which is:

"When a passenger alights from a street car it is his duty to look where he is going, and not to rush blindly into danger. Such a person is not relieved from the charge of contributory negligence if without looking he takes two steps from the car and then suddenly seeing an automobile, stops and is run down and injured."

We further cite upon this point the *Chesley case, supra; Smith* v. *City Ry. Co., supra; Harris* v. *Commercial Ice Co.,* 153 Pa., 278, and *Davis* v. *John Breuner Co.,* 167 Cal., 683. To the effect that the motorman was not bound to anticipate the negligence of the driver of the automobile, we cite *Denver City Tramway Co.* v. *Hills,* 50 Col., 328.

It must be conceded, in the consideration of this.

case, that with respect to the duty to warn the passenger the motorman had a right to presume that the laws relating to traffic would not be violated. In other words, he was entitled to the presumption that the automobilist would obey the law relating to speed, and if, as counsel for defendant in error argue, the motorman saw the automobile in question but fifteen feet away at the time that the decedent was about to alight, then it must follow upon the question of contributory negligence, and the duty resting upon the decedent in that respect, that the decedent, at least upon the last step of the car, and before alighting, had he taken observation, could have seen at that distance and remained on the step a moment until the automobile passed by; but, according to the record, the decedent failed to observe, because he did not look, and, as a consequence thereof, instead of remaining on the step of the car, he alighted in safety, assumed the functions and characteristics of a traveler, upon the termination of the relationship of carrier and passenger, and by reason thereof the accident complained of resulted.

The motorman was not bound to anticipate the negligence of the driver of the automobile. In all proper charges in personal injury cases, the legal proposition is laid before the jury that each party has the right to expect that the other will exercise ordinary care for his own safety, and that neither party is obliged to anticipate negligence on the part of the other.

From the record in the case, the decedent not only failed to exercise that care which ordinarily prudent persons exercise under the same circumstances, but even ignored the axiom that "self-preservation is the first law of nature."

It is the view of the court that the motorman, under the record in the case, was not guilty of any negligence whatsoever with respect to warning the decedent, and, therefore, the doctrine of contributory negligence would not apply in the face of this view. It is our further view, however, that the decedent failed to exercise ordinary care, as the record shows, and in this respect we believe the verdict is clearly and manifestly against the weight of the evidence.

In view of the above, and based upon the record in this case and the authorities cited, we hold that the relationship of carrier and passenger had terminated at the time and place of the accident, that the duty of the motorman toward the passenger had ceased, that the motorman was not charged, at the time the decedent was about to alight from the street car, with the duty of warning said decedent of the danger of the approaching traffic, and that the decedent failed to exercise ordinary care with respect to approaching traffic at the time of alighting from the car; and, thus holding, we are of the opinion that the court below committed prejudicial error in not granting the motion of defendant at the conclusion of the evidence to direct a verdict in its favor.

To hold otherwise would be to say that a carrier is liable to the passenger in any case, when, as in the case at bar, the passenger safely alights on the street and is injured by passing traffic, the danger of which was known to the passenger and the motorman alike, but of which the motorman failed to warn the passenger before he had left the car, notwithstanding the passenger failed to look or observe the danger for himself—a danger common to all persons, either before or after they leave the car. In

other words the danger from the traffic is a matter of common knowledge, known to the passenger as well as the carrier, and exists in every municipality such as Canton, whenever, and wherever a passenger alights, in these days of great municipal growth and expansion, and unless the carrier itself creates the danger, the situation with respect to the danger of the streets that arises in the case at bar prevails universally where the operation of street cars necessarily mingles with the general traffic of a municipal highway, where automobiles are overwhelmingly the medium of transportation in busy centers. To add the burden of traffic policeman to the responsibilities and obligations already charged upon the motorman by his duties in protecting the property of the carrier, and the passengers in his care, from the common dangers of the street, would be in a sense against public policy, as to do so would be at least as apt to increase the dangers to persons and property as to decrease them.

The judgment below is, therefore, reversed, and judgment is rendered in favor of plaintiff in error, the judgment which the court below should have rendered.

*Judgment reversed, and judgment for plaintiff in error.*

VICKERY, P. J., and INGERSOLL, J., concur.